**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 21, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CORRINE KOVNAT,

      Plaintiff - Appellant,

v.

XANTERRA PARKS AND RESORTS, a
Delaware corporation, and DOES 1
through 30, inclusive,

      Defendants - Appellees.

No. 13-8095

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 2:13-CV-00022-NDF)**

---

Submitted on the briefs:

Robert E. Schroth, Sr. and Robert E. Schroth, Jr., Jackson, Wyoming, for Plaintiff-
Appellant.

Aaron P. Bradford and Maxwell N. Shaffer of Lathrop & Gage LLP, Denver, Colorado,
for  Defendant-Appellee, Xanterra Parks & Resorts, Inc..

---

Before **BRISCOE,** Chief Judge, **LUCERO** and **McHUGH**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

Plaintiff Corrine Kovnat was injured while horseback riding in Yellowstone National Park. Kovnat filed this diversity action alleging negligence, as well as negligent training and supervision, on the part of defendant Xanterra Parks & Resorts (Xanterra), the provider of the horseback riding services. The district court granted summary judgment in favor of Xanterra, concluding that, in light of certain provisions of Wyoming's Recreational Safety Act, Wyo. Stat. Ann. § 1-1-121, et seq., Xanterra owed no duty of care to protect Kovnat from the injuries that she sustained. Kovnat now appeals from that ruling. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.[1]

I

*Factual background*

Kovnat and her husband, Gary, are residents of California. In late June 2012, Kovnat and her husband traveled to Yellowstone National Park in Wyoming for purposes of vacationing. On the afternoon of June 27, 2012, the couple signed up for an evening horseback trail ride at the Canyon Corral, located within the park grounds. Defendant Xanterra operates the Canyon Corral and is the provider of the horseback trail riding opportunities that originate there.

At the corral that evening, Kovnat and her husband joined other guests on a series

---

[1] After examining the brief and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is, therefore, submitted without oral argument.

of benches to await the ride. While still seated on the benches, the guests were instructed by Xanterra's wranglers on how to handle a horse. According to Xanterra, guests are instructed by wranglers that "[i]f they notice the saddle to be moving even a little bit, . . . they should stand up in the saddle and attempt [to] pull the saddle straight." App. at 139. Guests are also "instructed to let [a wrangler] know if there's an issue with their saddle." Id.

Following the safety speech, the guests, including Kovnat and her husband, proceeded into the corral to meet their horses. Kovnat was initially assigned a large black horse. Kovnat, concerned this horse was too big, explained to the wranglers that the horse scared her and requested a different horse. A wrangler responded by giving the large black horse to Kovnat's husband. The wrangler then walked back into the corral to retrieve a smaller horse named Tack for Kovnat to ride.

Kovnat had difficulty mounting Tack by herself. Consequently, a wrangler assisted her by "push[ing] [her up] by the butt several times." Id. at 59. More specifically, the wrangler "pushed [Kovnat] into the saddle sideways on her stomach," and "[o]nce on her stomach perpendicular to the horse she was able to maneuver herself into the saddle." Id. at 258. Once Kovnat was atop the horse, the wrangler placed her feet into the stirrups. Kovnat said to her husband, "It doesn't feel right. My left leg is straight and really long, and my right leg is really high up and bent. It feels uncomfortable." Id. at 64. According to Kovnat's husband, he "could see [a] difference in the posture of [Kovnat's] legs based on the flexion of her knee in the stirrup." Id. at

3

70. Kovnat's husband explained that Kovnat's "right foot was higher up, and the [right] knee was bent more, and [her] left foot was lower down, and . . . there was more extension of [her left] knee," making "it look[] uneven." Id. at 306.

A female wrangler who was standing nearby observing "kind of glanced" at Kovnat's stirrups, said "'Oh, it's fine,' and [then] walked away." Id. at 65. Kovnat, taking reassurance from the wrangler's comment, did not express any further concerns to the staff regarding her stirrups being uneven. She did, however, "mention[] to [her husband that] it still didn't feel right, but [that the female wrangler] must know." Id. at 66.

Kovnat, her husband, and the other guests left the corral in a single line, with Kovnat's husband in front of Kovnat. Xanterra wrangler Lisa Kever checked the cinch tension on each of the saddles as the riders left the corral. Kever specifically recalled checking the cinch tension on Kovnat's saddle. According to Kever, she observed three other employees also check the cinch tension on Kovnat's saddle.[2] Id. Kever did not, however, check Kovnat's stirrups.

The group of riders rode up a small slope or hill and then began riding on flat

---

[2] Kever did not identify the other three employees, nor did she specify precisely when the other cinch checks occurred. According to other evidence in the record, employees at Canyon Corral are trained to check saddle cinches "a minimum of three" times for each guest. App. at 112. The first check typically occurs when a wrangler is "personally loading a guest" on a horse. Id. The second check typically occurs "as soon as everyone is loaded onto their horse[s]." Id. "[A]ll of the wranglers that are in the corral that are not going on the ride [sh]ould . . . be walking up and down and checking [cinches] one more time." Id. Third, "there's always one to two [wranglers] standing" at the corral gate "checking cinches as" guests are "leaving the gate." Id.

terrain near an area called Jenna's Meadow.  Approximately fifteen minutes into the ride, Kovnat looked down at her saddle and "the thing in the middle, the horn, . . . started to move."  Id. at 69.  Kovnat "yelled out to the wrangler," but "the saddle pulled [her] all the way over" to the left and "underneath [her] horse."  Id.  In other words, "the saddle started to move to the left" and Kovnat "went with it" to the left and ultimately underneath the horse.  Id. at 72.  According to Kovnat, she struck her back on the ground.

Xanterra wrangler Luke Bannister responded to Kovnat's exclamation and movements, but was unable to reach Kovnat and her horse before Kovnat hit the ground. Kovnat immediately complained to Bannister that she was experiencing pain in her lower back.  Although Kovnat eventually stood up, she was unable to walk back to the corral on her own.  An emergency medical assistance team employed by the National Park Service was summoned, initiated care, and placed Kovnat on a backboard.  Kovnat was then carried by several persons to an awaiting ambulance and transported to a hospital in Livingston, Montana, where she was diagnosed with a fracture to her L1, L2, and L3 transverse process.

Shortly after Kovnat's accident, Bannister "went to remove the saddle" from Tack, but "could not move [it]."  Id. at 140.  The saddle "was tight enough to where . . . the only way it could have been moved was to have a substantial amount of weight pulling it to one side or the other."  Id.  In Bannister's view, this meant that there "would not have been a loose cinch or a malfunction of the saddle causing it to roll."  Id. at 141.  Rather, he opined, "[i]t would have been a large amount of weight pulling the saddle one

5

direction or the other that would have caused it to roll." Id.

*Procedural background*

On February 4, 2013, Kovnat initiated this diversity action by filing a complaint against Xanterra. The complaint's first cause of action, entitled "Negligence/Premises Liability," alleged that Xanterra "negligently maintained, managed, controlled, and operated Canyon Corrals, in that [Kovnat's] horse was improperly saddle[d]." Id. at 8. The second cause of action, entitled "Complaint for Damages for Negligent Training and Supervision," id. at 9, alleged, similarly, that Xanterra "negligently maintained, controlled, managed, and operated the premises," and, more specifically, "negligently failed to maintain the horse saddle in a safe condition or warn . . . Kovnat of its unsafe condition." Id. at 10.

On September 27, 2013, Xanterra filed a motion for summary judgment. The motion asserted that "[u]nder the Wyoming Recreation Safety Act[(WRSA)], Wyo. Stat. [Ann.] § 1-1-121, *et seq.*, Xanterra owed no duty of care to protect [Kovnat] from the injuries . . . allege[d] in her Complaint." Id. at 25. The motion also asserted that "the record evidence d[id] not support a claim for negligent training and supervision, providing a separate and independent basis to dismiss [Kovnat's] Second Cause of Action." Id. Kovnat filed a response in opposition to Xanterra's motion.

On December 3, 2013, the district court issued an order granting Xanterra's motion for summary judgment. In addressing Kovnat's negligence claim, the district court concluded that "[t]he inherent risk issue/question, in the light most favorable to [Kovnat],

6

[wa]s whether a saddle slipping out of position because of uneven stirrups and/or an improperly secured cinch are inherent risks of horseback riding." Id. at 382. The district court determined that "reasonable minds c[ould not] differ that both asserted causes, whether in isolation or in conjunction, are inherent risks of horseback riding." Id. With respect to the cinch issue, the district court concluded that "because the tightening of a cinch is done without scientific precision, a cinch that is either too loose or too tight is always a possibility when horseback riding," id. at 385-86, and thus "is a risk that is 'characteristic' or 'typical' of and therefore 'inherent in' horseback riding," id. at 386. "Because of this," the district court concluded, "Xanterra's Wranglers had no duty to eliminate, alter, or control the risk." Id. The district court similarly concluded that "uneven stirrups are an inherent risk of horseback riding." Id. at 389. "As with the tightening of the saddle cinch," the district court explained, "there is no tool used to adjust and set stirrups and, thus, no scientific precision." Id. Continuing, the district court explained that, "[b]ecause the adjustment of stirrups is done using a human's 'best judgment,' such adjustments are subject to human error." Id. at 390. Thus, the district court emphasized, "without scientific precision, there is always the possibility a wrangler will place the stirrups too high or too low, either on both stirrups or only one." Id. In other words, the district court concluded, "the possibility of uneven stirrups is 'characteristic' or 'typical' of and therefore 'inherent in' horseback riding." Id. at 391. Lastly, with respect to Kovnat's claim of negligent training and supervision, the district court concluded that, "[b]ecause . . . Xanterra owed no duty to eliminate, control, or alter

7

the inherent risks" associated with horseback riding, "Xanterra c[ould not] be found liable for failing to properly train and supervise its employees." Id. at 394.

The district court entered final judgment in the case on December 3, 2013. Kovnat filed a notice of appeal on December 13, 2013.

II

On appeal, Kovnat challenges the district court's grant of summary judgment in favor of Xanterra. According to Kovnat, "[t]he factual determination at issue is whether [her] injuries are the result of negligence and not the result of inherent risk assumed by the participant of the activity," and "[t]his determination is material to the case and should be made by a jury." Aplt. Br. at 10. In turn, Kovnat asserts that the district court "erred in determining whether a loose cinch and uneven stirrups are inherent risks of horseback riding because the court analyzed these issues in a vacuum, without applying the extreme facts that occurred here." Id. Kovnat also asserts that, because Xanterra "owe[d] a duty to [her], the court below . . . erred in granting summary judgment as to the negligent supervision cause of action." Id. at 11.

*Standards of review*

We review the district court's summary judgment ruling de novo, applying the same legal standards as the district court. Doe v. City of Albuquerque, 667 F.3d 1111, 1123 (10th Cir. 2012). "Summary judgment should be granted if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Id.

8

In a diversity case such as this, "the substantive law of the forum state governs the analysis of the underlying claims." Haberman v. Hartford Ins. Grp., 443 F.3d 1257, 1264 (10th Cir. 2006). "Therefore, the substantive law of [Wyoming] applies and governs as we review the issues raised on appeal in this case." Id.

*The Wyoming Recreational Safety Act*

The district court, in granting summary judgment in favor of Xanterra, concluded that Xanterra was insulated from liability in this case by the WRSA. Two related provisions of the WRSA were central to the district court's grant of summary judgment in favor of Xanterra, and are in turn central to our resolution of this appeal:

§ 1–1–122. Definitions.

(a) As used in this act:

> (i) "Inherent risk" with regard to any sport or recreational opportunity means those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity;

> (ii) "Provider" means any person or governmental entity which for profit or otherwise, offers or conducts a sport or recreational opportunity. This act does not apply to a cause of action based upon the design or manufacture of sport or recreational equipment or products or safety equipment used incidental to or required by the sport or recreational opportunity;

> (iii) "Sport or recreational opportunity" means commonly understood sporting activities including baseball, softball, football, soccer, basketball, swimming, hockey, dude ranching, nordic or alpine skiing and other alpine sports, snowboarding, mountain climbing, outdoor education programs, river floating, hunting, fishing, backcountry trips, horseback riding and any other equine activity, snowmobiling and similar recreational opportunities and

9

includes the use of private lands for vehicle parking and land access related to the sport or recreational opportunity; . . .

Wyo. Stat. Ann. §§ 1–1–122 (2011).

§ 1–1–123. Assumption of risk.

(a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

(b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

(c) Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved pursuant to W.S. 1–1–109.

(d) The assumption of risk provisions in subsections (a) through (c) of this section apply irrespective of the age of the person assuming the risk.

Wyo. Stat. Ann. § 1–1–123 (2011).

As these provisions make clear, "horseback riding" is considered a "sport or recreational opportunity," and Xanterra is considered a "provider" for purposes of the WRSA. Wyo. Stat. Ann. § 1-1-122(a)(ii)-(iii). Thus, Xanterra "is not required to eliminate, alter or control the inherent risks" associated with horseback riding, Wyo. Stat. Ann. § 1-1-123(b), "and any person who chooses to take part in [horseback riding provided by Xanterra] assumes all inherent risks which are associated with that [activity]," Halpern v. Wheeldon, 890 P.2d 562, 565 (Wyo. 1995). The result is that Kovnat may not sue Xanterra for negligence if the "damage, injury or death" alleged by

10

her in her complaint was "the result of an inherent risk" of horseback riding. Wyo. Stat.

Ann. § 1-1-123(c). In other words, Kovnat "carr[ies] the burden of establishing that [her]

injury was not caused by an inherent risk" of horseback riding. Cooperman v. David, 214

F.3d 1162, 1165 (10th Cir. 2000).

*Assessing inherent risk under the WRSA*

"Under the plain and ordinary language of the [WRSA], a risk . . . must be

characteristic of or intrinsic to the sport or recreational opportunity" for it "to be classified

as being an inherent risk." Halpern, 890 P.2d at 565.[3] "In determining whether a certain

risk is inherent to a sport," a court or jury is "taken to the level of specificity that the facts

support." Cooperman, 214 F.3d at 1167. "While at some level all sports have inherent

risks, as we add in the facts of a specific risk encountered the risk may or may not be

inherent." Id.

The circumstances of each case control whether the question of inherent risk is to

---

[3] Halpern applied the original version of the WRSA, which defined "inherent risk" as "any risk that is characteristic of or intrinsic to any sport or recreational opportunity *and which cannot reasonably be eliminated, altered or controlled*." Wyo. Stat. Ann. § 1-1-122(a)(i) (1989) (emphasis added). Consistent with this original statutory language, Halpern held that, in addition to being characteristic of or intrinsic to the sport or recreational opportunity at issue, an inherent risk is "one which cannot be reasonably eliminated, altered, or controlled." 890 P.2d at 565.

After Halpern was issued, the Wyoming legislature amended the WRSA to eliminate the italicized language in the definition of "inherent risk." Since that amendment, we have concluded that the Wyoming Supreme Court would apply the same analytical approach to the amended WRSA as it did to the original WRSA (save for the second inquiry that was eliminated by the Wyoming legislature). Sapone v. Grand Targhee, Inc., 308 F.3d 1096, 1102 (10th Cir. 2002); Cooperman v. David, 214 F.3d 1162, 1166 n.3 (10th Cir. 2000).

11

be decided by the court or by a jury.  That is because "[t]he level of factual specificity required to establish an inherent risk will often but not always preclude summary judgment on the duty question."  Creel v. L&L, Inc., 287 P.3d 729, 737 (Wyo. 2012). When, as is typically the case, "genuine issues of material fact exist, it is proper to present the issue to the jury of whether a risk is inherent to a particular activity."  Halpern, 890 P.2d at 566; see Beckwith v. Weber, 277 P.3d 713, 722 (Wyo. 2012) ("[T]he question of whether a particular risk is inherent in an activity covered by the [WRSA] is generally one for the jury to decide.").  In contrast, "where no genuine issues of material fact exist, [a] district court may decide as a matter of law that the provider does not owe a duty to the participant."  Halpern, 890 P.2d at 566.  More specifically, the question of inherent risk "can be made as [a] matter of law on summary judgment only when the case involves undisputed facts and when reasonable persons could only conclude that an injury or death was caused by an inherent risk."  Beckwith, 277 P.3d at 722.

*Cooperman*

Before applying these principles to the specific claims asserted by Kovnat against Xanterra, we find it useful to examine our decision in Cooperman, which considered, in the context of applying the provisions of the WRSA, the inherent risks associated with horseback riding.

In Cooperman, plaintiffs Dr. Howard and Trudy Cooperman, accompanied by other family members, hired defendant Matt David, doing business as Wyoming Rivers and Trails (WRT), "to guide them on a horseback ride outside Pinedale, Wyoming."  214

12

F.3d at 1163.  The first half of the trip, "from Fort William to an area where the group stopped for lunch," was uneventful.  Id.  "During the lunch break, Dr. Cooperman's saddle was loosened, but was tightened down again by one of the [WRT] employees before he remounted the horse for the return trip to Fort William."  Id.  "Approximately fifteen minutes after the lunch break, the group stopped, either to wait for slower riders or to rest the horses."  Id.  "At that point, Dr. Cooperman felt his saddle begin to slide."  Id.  "The saddle slipped all the way around the belly of the horse, causing Dr. Cooperman to fall to the ground and suffer injury to his right shoulder area."  Id.  "Prior to the saddle slipping, Dr. Cooperman had not had any problems with his horse or his saddle, and had not sensed that anything was wrong with the saddle."  Id.

The Coopermans subsequently filed suit against WRT in federal district court "alleging that WRT owed [Dr. Cooperman] a duty of reasonable care which was breached."  Id.  "Trudy Cooperman . . . also brought a claim for loss of consortium as a result of WRT's allegedly negligent acts."  Id.  "WRT moved for summary judgment, arguing that under the [WRSA], a slipping saddle is an inherent risk of horseback riding."  Id. at 1163-64.  "The district court [ultimately] found that the evidence presented by WRT, in particular the testimony of the Coopermans' expert witness, showed that slipping saddles were an inherent risk of horseback riding."  Id. at 1164.  "Because the district court found that the Coopermans had presented no evidence to dispute this finding, nor had the Coopermans put on evidence establishing a more precise cause for the accident that was not an inherent risk, the court determined that there were no material

13

questions of fact precluding the grant of summary judgment." Id. The Coopermans

appealed the district court's grant of summary judgment in favor of WRT.

We began our analysis by noting that, "[i]n order to prevail on any negligence

action, a plaintiff must first establish that the defendant owed him or her a duty of care."

Id. at 1165. "Under the [WRSA]," we noted, "a provider of a recreational opportunity

such as horseback riding has no duty or corresponding liability to participants for injuries

resulting from inherent risks." Id. Consequently, we concluded, "[w]hether WRT owed

Dr. Cooperman a duty of care depend[ed] on whether [his] slipping saddle . . . was an

inherent risk of horseback riding under the [WRSA]." Id. In other words, we concluded,

"if the slipping of Dr. Cooperman's saddle [wa]s an inherent risk of horseback riding

under the [WRSA], WRT owed no duty and the court need never get to the issue of

negligence." Id. at 1166.

"Horseback riding," we noted, "undoubtedly carries some inherent risk that the

rider will fall off the horse and get injured." Id. at 1167. For example, "[a] horse . . .

stumbl[ing] on an uneven path, or rear[ing], or simply begin[ning] to gallop for no

apparent reason . . . clearly would qualify as inherent risks of horseback riding." Id. We

emphasized, however, that "[s]imply because some risks are inherent in horseback riding

. . . does not mean that all risks of falling from a horse are necessarily inherent." Id.

"[I]nstead," we stated, "it is necessary to look factually at the specific risk to which the

rider was exposed." Id.

The factual record in Cooperman, we noted, "show[ed] that [Dr. Cooperman's]

14

saddle slipped." Id. at 1168. "If this were the only fact . . . presented," we stated, "we would quickly . . . hold that saddle slipping is an inherent risk of horseback riding." Id. We explained:

> The Coopermans' own expert testified that saddles slip for a variety of reasons including: stretching leather, the tensing or relaxing of a horse, the horse losing weight from sweat, the compression of certain types of saddle pads and loosening of the cinch due to the movement of the horse, or the rider failing to ride straight in the saddle. The expert further stated that a slipping saddle is always a possibility when horseback riding; that this was not the first time a saddle had slipped and it would not be the last. This evidence clearly indicates that a slipping saddle is an undesirable risk which is simply a collateral part of horseback riding. Thus, a slipping saddle, with no other facts provided, is an inherent risk of horseback riding.

Id. (citation omitted).

We concluded, however, that because the case "present[ed] facts which t[ook] us to a greater degree of specificity than simply stating that the saddle slipped," we were required to "take the analysis one step further." Id. Those facts, we noted, included "evidence that after Dr. Cooperman fell off the horse, his saddle was hanging loosely under the belly of the horse," as well as testimony from a WRT employee "that 'if the saddle just fell off and was hanging loosely under the belly, then obviously the saddle wasn't tightened enough.'" Id. In light of this evidence, we concluded, "[f]or purposes of summary judgment . . . the issue [wa]s whether a slipping saddle that [wa]s loosely cinched [wa]s an inherent risk of horseback riding." Id.

Continuing, we examined the evidence in the record regarding the cinching of saddles and reached the following conclusions:

> [B]ecause cinching a saddle is done by hand, and not with scientific precision, a provider must make a judgment call as to how tight or loose to cinch the saddle. This imprecision in the cinching of the saddle is "characteristic" or "typical" of and therefore "inherent in" the sport of horseback riding. It is an undesirable risk which is simply a collateral part of the sport. When the cinching of a saddle can be too tight or too loose, and the cinching is not done with scientific precision, it is inherent in the sport that the provider at times will cinch too loosely or too tightly. Thus, the testimony of WRT's employee that a saddle hanging underneath a horse would be evidence that the saddle was not cinched tightly enough does not take us outside the realm of inherent risk. It does not explain why the saddle was not cinched tightly enough.

Id.

We in turn concluded that "[a]s part of the Coopermans' burden of showing that WRT owed Dr. Cooperman a duty of care, the Coopermans must provide some evidence to explain why the saddle fell, which explanation is not inherent to the sport." Id. We explained that, because the WRSA provides "that a recreational provider has no duty to 'eliminate, alter or control the inherent risks within the particular sport or recreational opportunity,' . . . stating only that the cinch was not tight enough does not show that the risk was no longer inherent to the sport." Id. at 1168-69 (quoting Wyo. Stat. Ann. § 1-1-123(b)). In other words, we explained, "[t]he Coopermans ha[d] the burden of presenting some evidence on summary judgment that would raise a question of fact that the loosely cinched saddle was caused, not by an inherent risk, but rather by a risk that was atypical, uncharacteristic, not intrinsic to, and thus not inherent in, the recreational activity of horseback riding." Id. at 1169. We concluded, however, that the Coopermans failed to meet this burden and thus affirmed the district court's grant of summary judgment in

16

favor of WRT. Id.

In a final note, we stated:

Because under Wyoming law the question of what is an inherent risk is normally a question of fact for the jury, we do not attempt to set the parameters here as to what factual proof would take the risk of a slipping saddle outside the realm of an inherent risk. We can only say that presenting testimony that the saddle was not cinched tightly enough is not sufficient.

Id.

### *Kovnat's negligence claim*

We now turn to Kovnat's negligence claim against Xanterra. The district court concluded, and Kovnat essentially agrees, that "[t]he inherent risk issue/question, in the light most favorable to her, is whether a saddle slipping out of position because of uneven stirrups and/or an improperly secured cinch are inherent risks of horseback riding." App. at 382. Kovnat argues, however, that the district court erred in concluding, as a matter of law, that both of these were inherent risks of horseback riding. According to Kovnat, these "determination[s] [are] material to the case and should be made by a jury." Aplt. Br. at 10.

We conclude, as discussed below, that the district court properly granted summary judgment in favor of Xanterra with respect to the issue of the loose cinch. That is because Kovnat failed to present sufficient evidence to allow a jury to find that she was actually exposed to the risk of an unusually loose cinch. We do, however, agree with Kovnat that genuine issues of material fact exist regarding the issue of the uneven stirrups. As a

17

result, we conclude the district court erred in granting summary judgment in favor of Xanterra on this issue.

*a) Loose cinch*

Kovnat has consistently asserted, both in her district court pleadings and on appeal, that Xanterra personnel allowed her to ride with a loose cinch. But nothing in the record supports that assertion. Indeed, the undisputed factual record indicates that Xanterra personnel performed multiple cinch checks on Kovnat's saddle prior to her leaving the corral. According to the undisputed deposition testimony of Xanterra wrangler Lisa Kever, she observed three other Xanterra employees check the cinch tension on Kovnat's saddle prior to Kovnat and the other riders leaving the corral. Kever also testified, without dispute, that she personally checked the cinch tension on Kovnat's saddle as Kovnat left the corral. Lastly, Xanterra wrangler Luke Bannister testified that, immediately following Kovnat's fall from the horse, he "went to remove the saddle" from Tack but "could not move [it]" because it "was tight." App. at 140-41. Thus, there is simply no evidence that Xanterra's personnel failed to check the cinch prior to her leaving the corral or, relatedly, that Kovnat was exposed to the risk of riding with an unusually loose saddle cinch. Instead, the evidence in the record on appeal, even viewed in the light most favorable to Kovnat, indicates that Xanterra employees repeatedly checked the cinch tension on her saddle multiple times before she left the corral.

Given this set of undisputed facts, we agree with the district court that any risks associated with the cinching of Kovnat's saddle were inherent in the sport of horseback

18

riding. In Cooperman, we unequivocally held that "because cinching a saddle is done by hand, and not with scientific precision, a provider must make a judgment call as to how tight or loose to cinch the saddle." 214 F.3d at 1168. Consequently, "[t]his imprecision in the cinching of the saddle is 'characteristic' or 'typical' of and therefore 'inherent in' the sport of horseback riding. It is an undesirable risk which is simply a collateral part of the sport." Id. In other words, "[w]hen the cinching of a saddle can be too tight or too loose, and the cinching is not done with scientific precision, it is inherent in the sport that the provider at times will cinch too loosely or too tightly." Id. Thus, we conclude the district court properly granted summary judgment in favor of Xanterra with respect to Kovnat's claim that her fall and resulting injuries were the result of her saddle cinch being too loose.

b) Uneven stirrups

We reach the opposite conclusion with respect to Kovnat's claim regarding the uneven stirrups. Both Kovnat and her husband testified in their depositions that, after Kovnat was assisted by Xanterra personnel in mounting her horse, her stirrups were noticeably uneven. In particular, Kovnat testified that she immediately said to her husband, loud enough for Xanterra's wranglers to hear: "It doesn't feel right. My left leg is straight and really long, and my right leg is really high up and bent. It feels uncomfortable." App. at 64. Kovnat's husband, in turn, testified that he "could see [a] difference in the posture of [Kovnat's] legs based on the flexion of her knee in the stirrup." Id. at 70. More specifically, Kovnat's husband testified that Kovnat's "right

19

foot was higher up, and the [right] knee was bent more, and [her] left foot was lower down, and . . . there was more extension of [her left] knee," making "it look[] uneven."[4] Id. at 306. According to Kovnat, a Xanterra wrangler who was standing nearby observing Kovnat "kind of glanced" at the stirrups, said "'Oh, it's fine,' and . . . walked away."[5] Id. at 65. Finally, the evidence indicates that, during the course of the trail ride, Kovnat and her saddle rotated to the left side of her horse, i.e., the direction of the longer stirrup.

Viewing this evidence in the record in the light most favorable to Kovnat, we conclude that a jury could reasonably draw two alternate inferences from it. First, that the wrangler who overhead and responded to Kovnat's comments was not in a position to see both of Kovnat's stirrups and otherwise made no attempt to ensure that the stirrups were even. Or second, that this same wrangler was aware of the unevenness of Kovnat's stirrups but made a choice not to adjust them. We also note that either of these inferences would be supported by the additional evidence in the record, again viewed in the light most favorable to Kovnat, indicating that Xanterra's wranglers spent a considerable amount of time assisting Kovnat in mounting her horse (including obtaining a second horse to replace the first), and thus may have felt rushed to begin the trail ride.

---

[4] In her appellate brief, Kovnat argues that "[t]here is evidence that the stirrups were off by as much as 6 inches to the left when she set out." Aplt. Br. at 13. There is no evidence in the record, however, to support this specific detail.

[5] Xanterra argues, based upon this limited testimony from Kovnat's deposition, that "[t]he wrangler visually inspected her stirrups and found that they were appropriate for her." Aplee. Br. at 7. We conclude, however, that a jury could reasonably construe Kovnat's testimony on this point differently than suggested by Xanterra.

We in turn conclude that a jury could reasonably find that the risks posed by this set of facts are not inherent to the sport of horseback riding. As Kovnat has consistently argued throughout these proceedings, and as at least one of Xanterra's own wranglers conceded during discovery, uneven stirrups are visually noticeable and necessarily warrant corrective action. To be sure, the district court was correct in noting that the evidence in the record establishes that, like saddle cinching, the task of ensuring that a rider's stirrups are even is a matter of human judgment that is not performed "with scientific precision." Cooperman, 214 F.3d at 1168. But, viewing all of the evidence in the light most favorable to Kovnat, that is not what happened in this case. As discussed above, a jury could reasonably find that the wrangler who overheard and commented on Kovnat's concerns about her stirrups was not in a position to see both of Kovnat's stirrups and otherwise made no attempt to ensure that the stirrups were even, or was aware of the unevenness of Kovnat's stirrups but made a choice not to adjust them.

We conclude that, under either of these factual scenarios, Kovnat would have been exposed to an atypical risk, rather than a risk inherent in the sport of horseback riding. In turn, Xanterra would not be immune from liability under the WRSA. More specifically, Kovnat would not have assumed such an atypical risk, and Xanterra in turn would have had a duty to eliminate any such atypical risks. Consequently, we conclude the district court erred in granting summary judgment in favor of Xanterra on Kovnat's negligence claim, to the extent it was based on her allegation that she was permitted to ride with uneven stirrups.

21

*Kovnat's negligent supervision claim*

That leaves only Kovnat's claim against Xanterra for negligent training and supervision. We need not pause long in addressing this claim because Xanterra concedes "that the disposition of . . . Kovnat's negligent training and supervision claim depends on whether the [WRSA] disposes of . . . Kovnat's negligence claim." Aplee. Br. at 35. In light of this concession, we therefore affirm the district court's grant of summary judgment in favor of Xanterra on Kovnat's negligent training and supervision claim to the extent it was based on Kovnat's allegations of riding with a loose cinch, and reverse the grant of summary judgment on the negligent training and supervision claim to the extent it was based on Kovnat's allegations of being allowed by Xanterra employees to ride with uneven stirrups.

III

We AFFIRM in part and REVERSE in part the district court's grant of summary judgment in favor of defendant Xanterra, and REMAND for further proceedings consistent with this decision.

22