Kelly ANTHONY and Philip Anthony, husband and wife, and their children, M.A. and R.A., by and through their parents and next friends, Kelly Anthony and Philip Anthony, Plaintiffs,

v.

XANTERRA PARKS AND RESORTS, INC., a Delaware corporation, Defendant.

Case No. 2:14–CV–0014–SWS

United States District Court, D. Wyoming.

Signed March 9, 2015

Melanie M. Witte, Steven D. Hillyard, Law Offices of Steven D. Hillyard, San Francisco, CA, Terry W. Mackey, Cheyenne, WY, for Plaintiffs.

Aaron P. Bradford, Maxwell N. Shaffer, Holland & Knight LLP, Denver, CO, Angela L. Ekker, Lathrop & Gage, Denver, CO, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Scott W. Skavdahl, United States District Judge

This matter comes before the Court on *Defendant's Motion for Summary Judgment* on Plaintiffs' claims, which arise out of Plaintiff Kelly Anthony's fall off a horse while participating in a horseback ride provided by Defendant (ECF No. 28). The Court, having considered the briefs and materials submitted in support of the motion and Plaintiffs' opposition thereto, having heard oral argument of the parties and being otherwise fully advised, FINDS and ORDERS as follows:

### FACTS

On August 20, 2011, while on a family vacation in Yellowstone National Park, Plaintiffs decided to take a guided horseback trail ride at the Canyon Corrals, located in the Park and operated by Defendant Xanterra Parks & Resorts. Kelly and Philip Anthony executed Defendant's "Horseback Ride Acknowledgement of Risk" form which expressly advises horses can act unpredictably and horseback riding entails risk of injury. (Def.'s Ex. 3.) There were six riders on the trail ride in question—Plaintiffs' family and two others. Defendant assigned one wrangler, Mike Shinn, to accompany the ride.

Before getting on the horses, a wrangler spoke to the group of riders about what would happen on the ride and passed

around a cowboy hat to collect the guests' phones and other electronic devices. Jordan Albrecht and Gregg Albrecht, the two other guests on the ride, both put their cell phones in the hat. While one of the wranglers was giving the "safety speech," the other wranglers were with the already-saddled horses in the guest pen going through the tack inspection process. (Def.'s Ex. 5, Kever Dep. 63:6–25, 77–80.) The guests then began loading onto the horses with the wranglers matching the riders with the horses. Mrs. Anthony was assigned a horse named Tokyo. Tokyo was a reliable trail horse with approximately 150 hours out on trail rides (under the saddle with guests on him) in 2011. Although he had four incidents involving rider falls in 2010, Mrs. Anthony's fall was his only incident in 2011. Jordan Albrecht was assigned a horse named Madison. At least to Jordan, Madison seemed pretty mellow and well-broken.

Just before the ride left the stables, wranglers again checked Mr. and Mrs. Anthony's saddles. Mr. Anthony had requested that wranglers check his saddle, and a female wrangler complied. She indicated everything looked good with Mr. Anthony's saddle. Mr. Anthony also asked the wranglers to check his wife's saddle because he didn't think it was on tight enough. The wranglers again complied and tightened Mrs. Anthony's saddle a bit more. As the group left the stables, Mrs. Anthony had no thoughts that the equipment felt unsafe or uncomfortable. For most of the trip, the ride was uneventful. Tokyo was a bit feistier than the other horses, but nothing out of the ordinary. Mrs. Anthony, however, had been on lots of horses in her life and was not bothered by a feisty horse. As the ride progressed, Mrs. Anthony seemed to be generally enjoying the ride.

Near the end of the ride as the group approached the corrals, Jordan Albrecht and Madison were following just behind Mrs. Anthony and Tokyo. Madison was following Tokyo closely, pushing to get back to the corrals. When Tokyo whipped his tail, Madison pulled back her head getting Tokyo's tail hairs caught in Madison's reins. This commotion apparently spooked Tokyo, causing him to rear up and then kick his back legs in succession. Mrs. Anthony tried her best to stay on Tokyo, holding onto the horn of the saddle. In the process of Tokyo rearing and kicking, however, her saddle slipped to the left side and Mrs. Anthony fell off. Ms. Anthony felt like she was flying off Tokyo. At that point, Mrs. Anthony blacked out and was unconscious for a period of time. Mrs. Anthony's next memory was being on the ground.

During the commotion, the saddle separated from the cinch on the horse's offside. Following her fall, Mike Shinn, the wrangler assigned to the ride, went to Mrs. Anthony's aid. Within a minute or two, additional wranglers were running from the corrals to the scene. Liz Kever, Assistant Head Wrangler at the Canyon Corrals who had seen Mrs. Anthony fall, personally observed the broken leather strap—the offside latigo or billet. It was in two pieces and had clearly separated from the saddle. Up until the incident, the saddle had performed appropriately.

Following the incident, Mr. Anthony had an opportunity to observe the broken piece of leather. It appeared to be lighter in color and smooth. Ms. Kever also testified that the broken leather strap was a bit lighter in color and had a shiny look to it, was nice and thick throughout, and had no wear at the point of contact with the D ring. Additionally, Ms. Kever noted the leather did not show any evidence of dry rot or disrepair. Other than being broken in two, the leather appeared in good condition.

Wranglers employed with Xanterra at the Canyon Corrals are trained how to inspect each of the saddles for the horses. The purpose of this training is so each wrangler knows what to look for to create the safest environment for the guest. The "standard" at Canyon Corral is to have "a safe saddle and safe equipment on every horse." (Def.'s Ex. 5, Kever Dep. at 20–21.) Getting a trail ride ready to go is also a "standard" process. *Id.* 87: 6–16. The Canyon Corral starts operations at 6:30 in the morning. At that time, all of the dude horses are run down off their hill into the saddling chute. All of the horses that are "on" for the day get saddled in the chute. Each horse is assigned a particular saddle. For example, Tokyo had a specific place inside the saddling chute with his saddle and tack that was used with Tokyo every day. *Id.* at 30–31.

When saddling a horse, like Tokyo for example, wranglers put on his halter, grain bags, blanket, and saddle, then slide the cinch down off the right side ("offside"). A wrangler on the left side ("onside") of the horse places the saddle and blanket on and then the wrangler on the offside hands the cinch under the horse to the wrangler on the onside of the horse. The saddle is cinched up on the onside of the horse using latigo leather. The onside latigo is run through a D ring on the cinch, wrapped and then secured with a buckle. The offside latigo is run through a D ring and buckled. In contrast to the onside, the offside is not wrapped. *Id.* at 37–40.

Each saddle is looked over before it goes on the horse. If there's an obvious problem with the saddle, it is set aside and the horse is run through the chute, and the wranglers take care of it. *Id.* 40:18–25. While in the chute, the wranglers give a quick glance to the connection points of leather to the D rings and buckles. The full process of saddling all forty-two "on" horses for the day takes approximately

twenty-five minutes. Eight wranglers, including the Head Wrangler or Assistant Head Wrangler, are involved in this process. After the horses have been saddled and finished. breakfast, the horses are pushed out of the wrangle pens to the guest pens. *Id.* at 55–57.

Once in the guest pens, the wranglers do a full tack inspection. "[E]ven though they were just saddled, every horse, every ride, every time, the saddle gets loosened again and the saddle gets repositioned because things move." *Id.* 58:1–4. During this process, everything on the offside is checked: "[A]s the saddle is loose, walk around to the offside or the right side of the horse, double-check the billet, double-check the stirrup, making sure nothing is twisted to cause discomfort to the horse ... double-checking everything on that right-hand side." *Id.* 64:17–25. This is done by the wranglers, and then checked again by the lead, the assistant and the head wranglers. *Id.* 65:1–4. The tack, therefore, is inspected no less than four times before the first ride of the day, and before a guest ever mounts the horse. *Id.* 66:9–16. "It's the same form of inspection every time. There's nothing different. Every horse, every ride, every time." *Id.* 66:16–18.

Additional inspection occurs once the horse is matched with a guest. Before the guest is loaded, the saddle is checked for tightness. After the guest is loaded, the saddle is checked again. Before the wrangler leaves the guest, the wrangler checks the cinch. As a ride is leaving the corrals, the cinch is checked even a few more times. *Id.* at 118:10–119:1. Ms. Kever checked the saddles of all 42 "on" horses on August 20, 2011, both in the morning and throughout the day. She did not see any damage to any of the leather latigos/billets in use. *Id.* 115:8–19.

## STANDARD OF REVIEW

Summary judgment is appropriate where a movant shows "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (2010) (emphasis added). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir.2011) (internal quotations and citations omitted).

In reviewing a motion for summary judgment, the Court is to determine whether there is evidence to support a party's factual claim, *Jarvis v. Potter*, 500 F.3d 1113, 1120 (10th Cir.2007), and, in doing so, must view the evidence and draw reasonable inferences therefrom in a light most favorable to the nonmoving party, *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir.2011). "However, unsupported conclusory allegations do not create a genuine issue of fact." *Id.* (internal quotations and citations omitted). "A conclusory affidavit from an expert witness is therefore insufficient to defeat summary judgment. Similarly, mere speculation unsupported by evidence is insufficient to resist summary judgment." *Martinez v. CO2 Serv., Inc.*, 12 Fed.Appx. 689, 694–95 (10th Cir.2001) (citations omitted).

## DISCUSSION

In a diversity case such as this, the substantive law of the forum state governs the analysis of the plaintiffs' claims. *Kovnat v. Xanterra Parks and Resorts*, 770 F.3d 949, 954 (10th Cir.2014). Therefore, the substantive law of Wyoming applies here. Plaintiffs have brought claims against Defendant for negligence, strict liability, loss of consortium, and negligent infliction of emotional distress, all arising out of Mrs. Anthony's fall from Tokyo during the horseback trail ride provided by Defendant.

### A. Negligence Claims

To prevail on a negligence claim, a plaintiff must first demonstrate that a defendant owed her a duty to act with reasonable care. *Dunbar v. Jackson Hole Mountain Resort Corp.*, 392 F.3d 1145, 1148 (10th Cir.2004). By enacting the Wyoming Recreation Safety Act ("WRSA"), Wyo. Stat. § 1–1–121 et seq., the Wyoming legislature limited the duty a provider of recreational sports and activities owes to participants. *Id.* Under the WRSA, a provider of a "recreational opportunity," expressly defined to include horseback riding (§ 1–1–122(a)(iii)), has no duty to protect participants from "inherent risks" of the particular recreational opportunity. *Dunbar*, 392 F.3d at 1148; Wyo. Stat. § 1–1–123(b). In support of summary judgment on Plaintiffs' negligence-based claims, Defendant argues, pursuant to the WRSA, it owed no duty to protect Plaintiff Kelly Anthony from the injuries she claims, because any risks associated with the failure of the leather billet under the circumstances of this case were inherent in the activity of horseback riding.

In relevant part, the WRSA provides:

(a) Any person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity, whether those risks are known or unknown, and is legally responsible for any and all damage, injury or death to himself or other persons or property that results from the inherent risks in that sport or recreational opportunity.

(b) A provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity.

(c) Actions based upon negligence of the provider wherein the damage, injury or death is not the result of an inherent risk of the sport or recreational opportunity shall be preserved pursuant to W.S. 1–1–109.

WYO. STAT. § 1–1–123. "Inherent risk" is defined as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." *Id.* § 1–1–122(a)(i). Xanterra Parks and Resorts is unquestionably a "provider" for purposes of the WRSA. *See Kovnat,* 770 F.3d at 955. Thus, Plaintiffs may not sue Defendant Xanterra for negligence if the damages and injuries alleged by them were the result of an inherent risk of horseback riding. *Id.* In other words, Plaintiffs carry the burden of establishing that Mrs. Anthony's injury was not caused by an inherent risk of horseback riding. *Id.* (citing *Cooperman v. David,* 214 F.3d 1162, 1165 (10th Cir.2000)).

 "Horseback riding undoubtedly carries some inherent risk that the rider will fall off the horse and get injured," particularly where the fall results from the unpredictable actions of the horse. *Cooperman,* 214 F.3d at 1167. However, in determining whether a certain risk is inherent to a sport, a court or jury must evaluate the risk at *the level of specificity permitted by the factual record, i.e. that the facts support. Id.; Kovnat,* 770 F.3d at 955. Thus, under the circumstances of this case, the duty question should be framed as whether a saddle's offside latigo or billet leather breaking during use on a guided horseback trail ride and as a result of the horse's sudden rearing and jumping movements is an inherent risk of horseback riding. It is undisputed that a portion of the tack used on Tokyo—the offside latigo or billet leather—indeed broke while Mrs. Anthony was riding Tokyo on August 20, 2011. The witnesses agree that the billet broke following the sudden rearing and jumping by Tokyo. A horse is capable of producing enough power and force to break non-defective latigo leather. (Def.'s Ex. 7, Dainton Report at 1.)[1]

Plaintiffs' framing of the inherent risk question suggests Mrs. Anthony's fall from the horse and resulting injury was caused by the breaking of "substandard" billet leather that would have been revealed by a "reasonable and appropriate inspection." (*See* Pls.' Br. at 5). However, there is no evidence to support a finding that the offside billet leather was visibly faulty or defective or in poor condition, nor is there evidence that Defendant's standard inspection process was deficient in some manner or that the wranglers failed to perform the standard, multiple tack inspections on August 20, 2011 prior to Plaintiffs' trail ride. In the absence of such evidence, broken tack resulting from a horse's sudden movement in response to being spooked by the actions of another horse is a risk that is *not* "atypical or uncharacteristic" to the

---

1. Michael Dainton, Defendant's expert, is a "master saddler"—the highest distinction awarded in the industry—with over four decades of experience, having manufactured western saddles, built custom saddles, and repaired western saddles after failure. As part of his work, he maintains an understanding of horse biomechanics, including an understanding of the typical pressures and forces that horses can and do apply to saddles while in use. (Def.'s Ex. 7, Dainton Aff. ¶ 10.) Mr. Dainton further states there is a body of literature that master saddlers rely upon and understand when building and/or repairing saddles for any particular horse and rider. *Id.* "The literature on the biomechanics of normal and abnormal horse movement support the conclusion that horses will break leather during a reaction to the elements, especially unexpected ones." *Id.* In his report, he states he has personally repaired a number of saddles where new latigo leather fractured in much the same way as the circumstances presented in this case. (Dainton Report at 1.)

sport of horseback trail riding. *See Dunbar*, 392 F.3d at 1149. Rather, a broken billet under these circumstances is an undesirable, intrinsic risk which is simply a collateral part of the recreation activity. *Id.*

In an attempt to create a dispute of fact, Plaintiffs offer the opinion of their expert, Tom Rose, a long-time outfitter in Wyoming.[2] Upon his review of this case, Mr. Rose concluded that Tokyo, being a small horse, was "not capable of exerting the amount of force necessary to sever several wrapped layers of thick latigo material unless the latigo was already flawed to the point that it was not safely usable for its intended purpose." (Def.'s Ex. 9, Rose Report at 2.) Mr. Rose further opines, because the latigo *must have* been faulty, it would have been obvious upon a visual inspection, so the wranglers *must not have* performed a proper inspection. *Id.* at 2–3. However, Mr. Rose's opinions lack adequate foundation and are speculative and conclusory. First, Mr. Rose bases his opinion on the assertion no witness saw Tokyo performing "extreme equine acrobatics." While the Court is not clear on what is meant by this phrase, Mrs. Anthony testified that the billet break occurred following the sudden rearing and jumping movements by Tokyo. Second, Mr. Rose's report refers to the latigo as being wrapped several times, but that was not the case with the offside billet at issue here. (Pls.' Ex. 1, Rose Dep. at 86–89.) Third, Mr. Rose further bases his opinion on an experiment he performed under dissimilar circumstances. (Rose Dep. at 116–128; Dainton Report at 2.) It appears Mr. Rose ultimately reached his conclusion that latigo leather could only break when defective based on his never having experienced such a situation in his "42 years of horse experience." (Rose Report at 3.)

Plaintiffs' argument is essentially premised on the doctrine of *res ipsa loquiter*, which recognizes that in some cases it is reasonable to infer negligence from circumstantial evidence. *Goedert v. Newcastle Equip. Co., Inc.*, 802 P.2d 157, 158 (Wyo.1990). Wyoming law has accepted the doctrine of *res ipsa loquitur* in the following context:

> ■ [W]hen a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care, it affords reasonable evidence, in the absence of an explanation, that the injury arose from the defendant's want of care.

*Estate of Coleman v. Casper Concrete Co.*, 939 P.2d 233, 237–38 (Wyo.1997) (citing *Goedert*, 802 P.2d at 159). The Court finds this doctrine inapplicable here. Once situated on a horse with a rider, the saddle is no longer in the exclusive control of Defendant and, certainly once the ride begins, the unpredictable actions and movements of the horse are likewise outside of Defendant's control. Plaintiffs speculate the faulty tack would have been visually obvious to Defendant upon proper inspection; however, Plaintiffs argument assumes, without factual support, the tack was faulty or defective. Defendant had no "superior knowledge or ability to explain the occurrence" where the evidence of multiple inspections is undisputed and there is no evidence of visible defect or excessive wear and tear of the tack. *See Estate of Coleman*, 939 P.2d at 238 ("exclusive control" requirement now considered

---

**2.** The Court did not find Mr. Rose's resume attached to Plaintiffs' opposition brief. (*See* Pls.' Br. at 7.)

more a function of superior knowledge and ability to explain the occurrence, as opposed to actual physical control at the time of injury). As credibly established by the Report of Mr. Dainton, this is not a case in which the accident could not have occurred except through Defendant's negligence; to the contrary, there is an equally plausible explanation that the accident was caused by the unpredictable conduct of the horse, which is intrinsic to horseback riding. *See Martinez v. CO2 Servs., Inc.,* 12 Fed.Appx. 689, 695 (10th Cir.2001).

Stating only that the billet leather broke does not show that the risk was no longer inherent to the sport. *See Cooperman,* 214 F.3d at 1168–69. Plaintiffs have the burden of presenting some evidence that would raise a question of fact that the broken billet strap was caused, "not by an inherent risk, but rather by a risk that was atypical, uncharacteristic, not intrinsic to, and thus not inherent in, the recreational activity of horseback riding." *Id.* at 1169. The Court finds Plaintiffs have not met this burden.[3]

### B. *Strict Liability*

The Wyoming Supreme Court has adopted the following elements of a strict liability claim:

(1) that the sellers were engaged in the business of selling the product that caused the harm;

(2) that the product was defective when sold;

(3) that the product was unreasonably dangerous to the user or consumer;

(4) that the product was intended to and did reach the consumer without substan-

tial change in the condition in which it was sold; and

(5) that the product caused physical harm to the plaintiff/consumer.

▬▬ *Rohde v. Smith's Med.,* 165 P.3d 433, 437 (Wyo.2007). Plaintiffs have failed to show how Defendant qualifies as a "seller" for purposes of a strict liability claim. Further, Plaintiffs offer no direct *evidence* to support a finding the saddle part at issue was defective when sold, or even when in use on August 20, 2011. "It is not enough to show that an injury occurred during use of the product to establish it was defective." *Id.* "Instead, a plaintiff must show a defect in the product, which he may do either by presenting evidence of a specific defect or by inference." *Id.* (citing *Sims v. General Motors Corp.,* 751 P.2d 357, 360–61 (Wyo.1988)).

In *Sims,* the Wyoming Supreme Court "rejected the plaintiffs' contention that mere proof of a product malfunction was sufficient to create an inference that the product was defective." *Id.* at 438. Instead, the plaintiff must present evidence that there was "no abnormal use and no reasonable secondary causes for the malfunction." *Id.* Plaintiffs' reliance on Mr. Rose's unfounded and speculative conclusions is insufficient to satisfy their burden. In contrast, the well-supported opinions of Mr. Dainton establish that failures like the one Mrs. Anthony experienced have occurred and will continue to occur in leather that is otherwise appropriate for use.[4] (*See* Dainton Report.) Therefore, the Court finds no genuine dispute as to any material fact on Plaintiffs' strict liability

---

**3.** Plaintiffs' claims for negligent infliction of emotional distress and loss of consortium also fail as they are dependent on the underlying negligence claim related to Mrs. Anthony's injuries. *See Hendricks v. Hurley,* 184 P.3d 680, 686–87 (Wyo.2008).

**4.** Mr. Dainton bases his opinion upon his 'knowledge and experience with latigo leather used as an off-side billet with a stainless steel buckle. Contrary to the Anthonys' expert, latigo leather breaks during use when a horse exerts its power and strength upon the latigo/buckle.' (Dainton Report at 1.)

claim, and Defendant is entitled to judgment as a matter of law.

CONCLUSION

"The circumstances of each case control whether the question of inherent risk is to be decided by the court or by a jury." *Kovnat*, 770 F.3d at 955. Plaintiffs have provided no evidence to explain why the saddle's offside billet leather broke, which explanation is not inherent to the sport of horseback riding. *See Cooperman*, 214 F.3d at 1168. This case involves undisputed facts, and the Court finds reasonable persons could only conclude that Mrs. Anthony's injury was caused by an inherent risk of horseback riding. Accordingly, the Court can appropriately determine the question of inherent risk as a matter of law on summary judgment, *Kovnat*, 770 F.3d at 956.

The Court finds no genuine disputes of any material fact on Plaintiffs' claims, and Defendant is entitled to judgment as a matter of law. THEREFORE, it is hereby

ORDERED that Defendant's Motion for Summary Judgment (ECF No. 28) is GRANTED.